## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROBERT HAUGHTON,
*Plaintiff*,

No. 3:19-cv-00359 (MPS)

v.

TOWN OF CROMWELL; CROMWELL POLICE
DEPARTMENT,
        *Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Haughton, a police officer with the Cromwell Police Department
("CPD"), has filed suit against the CPD and the Town of Cromwell (the "Town").  He alleges
race- and gender-based discrimination and retaliation in violation of Title VII of the Civil Rights
Act of 1964 based on the defendants' decision not to make him a detective during the summer of
2017.  The defendants move for summary judgment on all of Haughton's claims.  In addition, the
defendants assert that the CPD is not a proper defendant to this lawsuit because it is not an entity
capable of being sued.  For the reasons set forth below, the defendants' motion for summary
judgment is GRANTED.  Because I grant summary judgment as to all claims, I do not address
the issue of whether the CPD is an entity capable of being sued.

### I.        Factual Background

The plaintiff's Local Rule 56(a)2 statement failed to comply with the requirements of the
local rule, and the only evidence he has presented not already presented by the defendants in
their Local Rule 56(a)1 statement is excerpts of the contract between the CPD and the Cromwell
Police Union.  ECF No. 39-2.  As a result, I deem all facts included in the defendants' Local
Rule 56(a)1 statement that are supported by evidence and not contradicted by the plaintiff's sole

exhibit admitted.  *See* Loc. R. Civ. Proc. 56(a)3 ("Failure to provide specific citations to the evidence in the record as required … may result in the Court deeming admitted certain facts that are supported by evidence in accordance with Local Rule 56(a)1."); *see also Johnson v. Connecticut Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013), *aff'd* 588 F. App'x 71 (2d Cir. 2015) ("[W]here the Plaintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted.").  The facts set forth below are taken from the defendants' statement and supporting exhibits and the plaintiff's exhibit.

The Town operates the CPD, a paid professional police department that employs approximately twenty-six sworn police officers.  ECF No. 32-2 at ¶ 1.  In 2017, CPD employed one chief of police, one captain, five patrol sergeants, one detective sergeant, and various police officers.  *Id.* at ¶ 6.  The only promotional positions in the CPD are sergeant, captain, and chief. *Id.* at ¶ 7.  In addition to promotions, the CPD offers special assignments, which include school resource officer ("SRO"), bicycle patrol officer, child safety seat installer, field training officer ("FTO"), marine patrol officer, and detective.  *Id.* at ¶ 8.  Unlike the promotional positions, the special assignments do not require applicants to participate in a formal examination process.  *Id.* at ¶ 9.  Officers specially assigned to the Detective Division are entitled to a ten and one-half percent increase in their existing pay rate.  ECF No 39-2 at 5.[1]  While the defendants contend that the CPD does not have a formal seniority system, *Id.* at ¶ 31, the excerpts of the contract between the CPD and the Cromwell Police Union provided by Haughton indicate that the CPD does have a seniority system according to which seniority affects "vacation scheduling, layoff, and recall" and salary.  ECF No. 39-2 at 3-4. Haughton has presented no evidence that this

---

[1] This ruling cites ECF page numbers throughout.

contract required seniority to be considered in promotional or special assignment decisions.  *See id.*

Haughton, "a black male," joined the CPD as a police officer in May 2001.  ECF No. 32-2 at ¶ 12.  He has been employed by the Town since.  *Id.* at ¶ 13.  In 2004, the CPD's then-Captain asked Haughton to serve as a bicycle patrol officer.  *Id*. at ¶ 14.  Haughton completed the necessary training to become a police cyclist and has served as a bicycle patrol officer since then.  *Id.* at ¶ 15.  In 2007, the then-Captain asked Haughton to serve as a child safety seat installer.  *Id.* at ¶ 16.  To hold this special assignment, an officer is required to participate in a training program and pass an examination.  *Id.*  Haughton failed that examination twice, *id.* at ¶ 17, and, as a result, did not become a child safety seat installer.

In late 2012 or early 2013, Haughton expressed to then-Captain Denise Lamontagne an interest in either a detective or FTO special assignment.  *Id.* at ¶ 18.  Officers interested in becoming FTOs must complete an FTO training course.  *Id.* at ¶ 19.  In February 2013, Lamontagne offered Haughton a spot in an upcoming training course, but he was unable to attend because he was on vacation.  *Id.* at ¶ 19-20.  In September, Lamontagne again offered Haughton the chance to attend an FTO training course.  *Id.* at ¶ 21.  Haughton attended the course in November, was certified to become an FTO, and has served as an FTO for the CPD since then.  *Id.* at ¶ 22.

In the spring of 2013, a detective position became available.  *Id.* at ¶ 23.  In May, the then-Chief appointed an officer named Pamela Young to that position.  *Id.* at ¶ 24.  In November 2013, Haughton filed a complaint with the Connecticut Commission on Human Rights, claiming that he was not selected for the promotion based on his race, national origin, and previous complaints about discriminatory conduct.  *Haughton v. Town of Cromwell* ("*Haughton I*"), No.

14-cv-1974 (VLB), 2017 WL 2873047, at *1 (D. Conn. July 5, 2017).  He received a right to sue

letter from the Equal Employment Opportunity Commission and, on December 30, 2014, filed a

federal lawsuit against the Town and the CPD.  *Id.*  On July 5, 2017, the Court in that case

granted summary judgment to the defendants.  *Id.*  Haughton has never discussed this lawsuit

with his supervisors.  ECF No. 32-2 at ¶ 65.

A detective position next became available in the summer of 2017, due to promotions

within the CPD.  ECF No. 32-2 at ¶ 25.  At that time, Lamontagne was the Chief of Police,

Kevin VanderSloot was the Captain, and Steven Penn was the sergeant in charge of the detective

division.  *Id.* at ¶¶ 2-5.  On July 6, 2017, Lamontagne emailed CPD officers, including

Haughton, notifying them of the vacancy.  *Id.* at ¶ 26.  Her email instructed any officer interested

in the detective special assignment to submit a letter of interest accompanied by three

investigative reports completed by the applicant.  *Id.* at ¶ 27.  It also explained that the officer

that filled the position should be able to work independently, investigate all matters,

communicate well with other agencies, write good reports, and be a liaison with the local

superior court.  *Id.* at ¶ 28.  Apart from this email, there was no written job description for the

special assignment.  *Id.* at ¶ 30.  The email stated that Lamontagne could assign any officer to the

position based on her beliefs about who was capable and had potential.  *Id.* at ¶ 29.

Haughton and fellow Officers Elizabeth Palmerie, Jeremy Perlini, and Jason Tolton

submitted letters of interest in the position.  *Id.* at ¶ 32.  Tolton is a black man, ECF No. 32-4 at ¶

35, and Palmerie is a white woman.[2]  Haughton did not read the three reports he submitted with

his letter of interest before he submitted them.  ECF No. 32-2 at ¶ 33.  On August 31,

VanderSloot emailed all four applicants thanking them for their interest in the position and

---

[2] While there is no evidence in the record that Palmerie is white, the parties do not appear to contest this point, and I
will, therefore, treat it as true for purposes of this ruling.

indicating that he and Penn would be scheduling meetings with each applicant. *Id.* at ¶ 34; ECF No. 32-9. Haughton did not receive this email because his email inbox was full and not receiving additional messages. EF No. 32-2 at ¶ 35. Lamontagne had previously warned Haughton about maintaining his email in box in 2013, when Haughton's inbox stopped receiving emails because it was full. *Id.* at ¶ 36. Haughton did eventually learn through speaking with other officers that VanderSloot and Penn would be meeting with the applicants. *Id.* at ¶ 35.

During Haughton's interview, he was asked to explain how the three cases he submitted with his application highlighted his investigative skills. *Id.* at ¶ 38. He responded, "I'm not going to lie; I did not read them before handing them in." *Id.* He explained that, in choosing which records to submit with his application, he asked the records department to pull three of his cases and then submitted the cases given to him without reviewing them. *Id.* at ¶ 37. VanderSloot and Penn explained to Haughton during his interview that the cases he submitted were not "substantial" enough to recommend him for the detective assignment, and they asked him to provide an example of a case in which he conducted an investigation. *Id.* at ¶¶ 39-40. Haughton provided as an example a case, which he estimated had occurred more than ten years earlier, in which he had observed a hand-to-hand drug transaction, stopped the car that received the drugs, and made an arrest. *Id.* at ¶ 41. When asked if he had furthered that drug case by identifying the other participants to the transaction and making an arrest, Haughton stated that he "thought so" but that he did not believe he would be able to identify the case or provide a copy of his report. *Id.* Haughton himself acknowledges that he appeared unsure of himself during the interview and that it did not go well. *Id.* at ¶¶ 42-43. He acknowledges that the questions VanderSloot and Penn asked him during the interview were appropriate and related to the detective assignment. *Id.* at ¶ 44.

Following the interviews, VanderSloot sent Lamontagne his impressions of each candidate.  *Id.* at ¶ 45.  VanderSloot explained that Tolton would have been his first choice, but that he had withdrawn from consideration because he was not interested in taking the position immediately.  *Id.* at ¶ 48.  He ranked Haughton third behind Officers Palmerie and Perlini, noting "I was hoping for more from Officer Haughton but was disappointed with the serious lack of effort in this matter."  ECF No. 32-15 at 3.  He also observed that Haughton "submitted reports … lacking any investigative effort."  *Id.* at 2.  Penn also sent a memorandum to Lamontagne, which provided the following ranking of the candidates: "1. Officer Palmerie 2. Officer Perlini 3. Officer Haughton 4. Officer Tolton (withdrew)."  ECF No. 32-2 at ¶ 46; ECF No. 32-16 at 3.  Penn noted that either Palmerie or Perlini would be well-suited to the detective assignment.  ECF No. 32-2 at ¶ 47.  Penn observed that Haughton "[w]as not prepared for the interview."  ECF No. 32-16 at 1.

On September 8, 2017, Lamontagne assigned Palmerie, who had laterally transferred from the University of Connecticut Medical Center to the CPD in 2014, to the detective position.  *Id.* at ¶¶ 52-53.  Haughton has a good impression of Palmerie.  *Id.* at ¶ 54.  He has reviewed some of her reports and, when asked what he thought of them, responded "I mean, like any other officer in the department it's always something good."  ECF No. 32-10 at 24-25.  Haughton has on various occasions had his own incident reports returned to him following a supervisor's review for various deficiencies.  ECF No. 32-2 at ¶ 58.  According to VanderSloot, Palmerie submitted "useful reports that highlighted her investigative abilities" with her application for the detective position; these reports showed that "she properly established the elements of the crime being investigated in each instance and conducted thorough investigations which were well documented."  ECF No. 32-5 at ¶ 32.  Haughton acknowledges that—at least prior to May

6

2013—he had issues with grammatical errors in his reports "all the time." *Id.* at ¶ 57; ECF No. 32-7 at 68. Haughton has not sought any additional report writing training during the last five years. *Id.* at ¶ 59.

Prior to September 2017, Tolton had been appointed to special assignments including marine patrol, child safety seat installer, and SRO. *Id.* at ¶ 60. In June 2019, Tolton was assigned to a detective position in the youth bureau. *Id.*at ¶ 61. Prior to September 2017, Officer David Ellison, who is also black, had been assigned to the detective division. *Id.* at ¶ 62. He has been approached on various occasions about returning to that assignment based on his exemplary performance; he was the first officer Chief Lamontagne approached about filling the vacant detective position in the spring of 2013. *Id.* at ¶¶ 62-63.

Haughton testified at his deposition in December of 2019 that no one in the CPD had in the past three years said anything he considered to be racist. *Id.* at ¶ 67; ECF No. 32-10 at 46. Haughton specifically acknowledged at that deposition that he did not think Penn was a racist or that he would discriminate against someone based on their gender. ECF No. 32-2 at ¶ 50. He does not think that Penn ranked the detective position applicants based on their race or gender. *Id.* at ¶ 49. He also does not think that Penn would retaliate against him because of his prior lawsuit. *Id.* at ¶ 51.

Haughton did not voice his concerns about not receiving the detective assignment to Lamontagne or his supervisors until six months after his rejection, in March of 2018, when he filed a complaint with the Connecticut Commission on Human Rights and Opportunities. *Id.* at ¶ 64.

## II.    Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.   Discussion

### A.  Discrimination Claims

Title VII makes it unlawful for an employer to discriminate against any individual because of that individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Thus, "[a]n employment decision ... violates Title VII when it is based in whole or *in part* on discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.2008) (internal quotation marks omitted) (emphasis in original).  Courts evaluate Title VII discrimination claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, a plaintiff must first establish a *prima facie* case of

discrimination.  *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To do so, he must

show that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job

for which the employer was seeking applicants; (3) [he] suffered an adverse employment action;

and (4) the circumstances surrounding that action permit an inference of discrimination."  *See*

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).  "The burden a plaintiff,

alleging that he was discriminated against by his employer, carries to survive a summary

judgment motion at the prima facie stage is a minimal one." *Graham*, 230 F.3d at 38.  If the

plaintiff establishes all four elements, the burden then "shifts to the employer to articulate a

legitimate, non-discriminatory reason for the employee's dismissal." *Id.*  If such a reason is

supplied, "the burden shifts back to the plaintiff to prove that discrimination was the real reason

for the employment action." *Id.*; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

253 (1981) ("Third, should the defendant carry [its] burden, the plaintiff must then have an

opportunity to prove … that the legitimate reasons offered by the defendant were not its true

reasons, but were a pretext for discrimination.")

I conclude that Haughton has made out a *prima face* case of discrimination, but that the

defendants have offered a legitimate, non-discriminatory reason for their decision not to give him

the detective special assignment, and that Haughton has failed to present evidence that this

reason was pretextual.

### 1. Prima Facie Case

The defendants do not contest that Haughton is a member of a protected class, that he

was qualified for the position of detective, and that his non-selection for the detective position

constituted adverse action.  Rather, they argue that Haughton has failed to show circumstances

surrounding the decision not to offer him the detective position that permit an inference of

discrimination.  An inference of discrimination can be drawn from circumstances such as "the more favorable treatment of employees not in the protected group."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).  Promotion of a similarly situated employee not in the plaintiff's protected group is sufficient to support an inference of discrimination.  *See Haughton I*, 2017 WL 2873047, at *9 ("Because a similarly situated white employee was promoted instead of the Plaintiff … Plaintiff has met the de minim[i]s standard for establishing a prima facie case of discrimination.")  Haughton argues that the fact that a white woman was selected for the detective position over him in the summer of 2017 is sufficient to support an inference of discrimination at this stage.  *See* ECF No. 39-1 at 10.[3]  The defendants counter that Haughton has failed to establish an inference of discrimination because he has been recommended for and assigned to other special assignments during the course of his employment with the CPD (including FTO, child safety seat installer, and bicycle officer), a black male officer (Ellison) was the first to be offered the 2013 detective position (although he turned it down), and another black male officer (Tolton) was Captain VanderSloot's first choice for the 2017 detective position.  *See* ECF No. 32-1 at 13.  I disagree with the defendants.  Whether Haughton received other special assignments in the past does not bear on the question of whether he was discriminated against in the hiring process for the 2017 detective position vacancy.  Similarly, the fact that another black man may have been offered the detective position in 2013 does not help clarify what occurred during the 2017 process.  Finally, while a showing that another black male officer had been offered the 2017 detective position would undermine Haughton's discrimination claim, the evidence shows only that one of the interviewers

---

[3] Haughton also points to a white woman being selected for the prior detective vacancy in the spring of 2013 as evidence supporting an inference that the 2017 process was discriminatory.  But the Court in *Haughton I* concluded that there was no discrimination in that selection process, so Haughton cannot rely on the selection of a white woman to fill the prior detective vacancy to show a pattern of discrimination.

communicated to the decisionmaker (the Chief) that this other officer would have been his first choice and that he did so only after the officer had withdrawn from consideration for the position. The evidence shows that a similarly situated white, female officer was offered the position over Haughton. Construing that evidence in the light most favorable to Haughton, I conclude that he has met the minimal burden of establishing a *prima facie* case of race- and gender-based discrimination.[4]

### 2. Non-Discriminatory Reason for Non-Selection

Because Haughton has established a *prima facie* case, the burden shifts to the defendants to offer a legitimate, non-discriminatory reason for their decision not to give Haughton the detective position. The defendants have submitted evidence showing that Haughton was not selected for the detective position because of his poor interview performance and weak application, both of which indicated not only lack of preparation but also lack of skills and experience relevant to the role of detective. Employers may use interview performance as a deciding factor in an employment decision. *See Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 688-89 (S.D.N.Y. 2020) ("Defendants have carried [their] burden [of offering a legitimate, non-discriminatory reason for their decision not to promote the plaintiff] by submitting evidence showing that [the plaintiff] was not promoted because [he] performed poorly at his interview and seemed unprepared for the job."); *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir. 2001) ("[T]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an

---

[4] In his memorandum in opposition to the defendants' motion for summary judgment, ECF No. 39-1, Haughton argues that he was discriminated against based on his national origin and color as well as his race and gender. But Haughton's complaint, ECF No. 1, does not allege discrimination on either basis—it does not even mention that Haughton is of Jamaican origin. For this reason, I consider only Haughton's race and gender discrimination allegations here. *See Smith v. City of New York*, 385 F. Supp. 3d 323, 338 (S.D.N.Y. 2019) ("[A] party may not use his or her opposition to a dispositive motion as a means to amend the complaint.") (quoting *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007)).

interview."). Still, the Second Circuit has "cautioned that an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion." *Byrnie*, 243 F.3d at 104 (internal quotation marks omitted). So "an employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext." *Id.* When the explanation, "offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn." *Id.* (internal quotation marks and alteration omitted).[5]

Here, Penn observed that Haughton was "not prepared" for his interview, ECF No. 32-16 at 1, and VanderSloot expressed disappointment at Haughton's "serious lack of effort" in preparing for and participating in the interview. ECF No. 32-15 at 3. Haughton admitted during the interview that he had not read the investigative reports he submitted as part of his application, telling VanderSloot and Penn, "I'm not going to lie; I did not read them before handing them in." ECF No. 32-2 at ¶ 38. Haughton himself acknowledges that he appeared unsure of himself during the interview and that it did not go well. *Id.* at ¶¶ 42-43. Further, VanderSloot observed that the investigative reports Haughton submitted as part of his application for the detective position failed to demonstrate "any investigative effort." ECF No. 32-15 at 2. When offered the

_____

[5] Haughton argues that the selection process in this case was too subjective, because Chief Lamontagne's email stated that she could assign the person she found "capable and [with] the potential." ECF No. 39-1 at 11-12; ECF No. 32-8 at 2. The same email noted, however, that applicants should "submit a letter of interest and indicate three (3) investigative reports you have completed, if they ended in arrests please make sure that information is included." ECF No. 32-8 at 2. The email also stated that "[t]he person assigned to the Detective Division should be able to work independently, investigate all matters, communicate well with other agencies, write good reports and be a liaison with [the Superior Court]." *Id.* Thus, the email identified clear, objective criteria for the position, in addition to noting that the Chief would exercise her discretion. In their assessment of Haughton and Palmerie, VanderSloot and Penn noted, among other things, that while the investigative reports submitted by Haughton failed to show "any investigative effort," those submitted by Palmerie were "useful," "highlighted … her investigative abilities," "properly established the elements of the crime," and reflected "thorough investigations which were well documented." ECF No. 32-15 at 2. These assessments matched Chief Lamontagne's criteria for "investigat[ing] all matters" and "writ[ing] good reports." This is not a situation, then, in which the employer used "wholly subjective and unarticulated standards to judge employee performance for purposes of promotion." *Byrnie*, 243 F.3d at 104.

chance to provide another example of a case in which his work displayed investigative effort, Haughton could recall only one case, which was over ten years old, in which he had observed a hand-to-hand drug transaction and then stopped the car that received the drugs. *Id.* at ¶ 41.  He was not certain whether he had furthered the case by identifying the other participant(s) to the transaction, saying only that he "thought" he had.  *Id.*  He was not able to identify the case or provide a copy of the report that he prepared for it.  *Id.*  In contrast, VanderSloot observed that Palmerie, the officer who was assigned to the detective vacancy, "submitted useful reports that highlighted some of her investigative abilities" and in which "she properly established the elements of the crime being investigated in each instance and conducted thorough investigations which were well documented."  ECF No. 32-15 at 1.  Penn noted that Palmerie "[w]as prepared and interviewed well" and "[p]rovided complete and appropriate case/investigations for review" that were "documented thoroughly."  ECF No. 32-16 at 3.  The defendants have offered clear and specific reasons that Haughton did not receive the detective position—specifically, that he was unprepared for his interview and that he failed, through his written application and conversation during the interview, to show that he had the relevant investigative experience to perform well in the role of detective.

> 3.  Pretext

As the defendants have offered evidence that they had a legitimate, non-discriminatory reason for not giving Haughton the detective position, the burden shifts back to Haughton to offer evidence that this stated reason is pretextual.  Haughton has presented no direct evidence of discrimination, testifying at his deposition that no one in the CPD had in the past three years said anything he considered racist.  ECF No. 32-10 at 46.  Haughton instead argues that the defendants failed to follow clear guidelines in the detective selection process in violation of state

law, that he was more qualified than Palmerie for the position, and that both of these facts are evidence of pretext.

Haughton first argues that the defendants violated a Connecticut statute that requires municipal police forces to implement guidelines governing the promotion of minority police officers by not following any guidelines in the process of filling the detective vacancy, and that this violation is evidence of pretext. I disagree. It is true that failure to comply with statutory or internal guidelines can serve as evidence of pretext. *See Bagley v. J.P. Morgan Chase & Co.*, No. 10-CIV-1592, 2012 WL 2866266, at *15 (S.D.N.Y. July 12, 2012) ("Although violation of an organization's internal procedures alone is insufficient to create an inference of discrimination or retaliation, failure to follow internal procedures can be evidence of pretext.") (internal quotation marks, alterations, and citations omitted); *Agonafer v. Rubin*, 35 F. Supp. 2d 300, 304 (S.D.N.Y. 1998) (evidence of "clear and deliberate violation of collective bargaining agreement procedures" supported an inference that the defendant's proffered reason was mere pretext). But Haughton has not presented any evidence that the CPD violated the state statute during the detective selection process. The statute mandates that "[n]ot later than January 1, 2016," law enforcement agencies "develop and implement guidelines for the recruitment, retention and promotion of minority police officers." Conn. Gen. Stat. § 7-291b. Haughton has presented no evidence that the CPD failed to develop and implement such guidelines. Nor has he presented evidence that the CPD failed to comply with any such guidelines during the process of filling the detective vacancy. Thus, Haughton has failed to present any evidence of noncompliance with statutory or internal procedures that could lead a reasonable juror to conclude that the defendants' proffered reason for not selecting Haughton for the detective position was pretextual.

14

Second, Haughton argues that he was more qualified than Palmerie for the detective position because he had more years of experience with the CPD and because he had served for five years as a FTO, which he argues is a similar special assignment to that of detective.  ECF No. 39-1 at 16.  "[A]n employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." *Byrnie*, 243 F.3d at 103.  Still, courts "must respect the employer's unfettered discretion to choose among qualified candidates." *Id.*  Where a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, the plaintiff's credentials must be "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id.*  (internal quotation marks omitted). Haughton does not argue that Palmerie was not qualified for the detective position.  *Cf. Byrnie*, 243 F.3d at 111 (noting that selected candidate was "not even technically qualified for the job"). While Haughton had about thirteen years more experience than Palmerie with the CPD, he has presented no evidence that she lacked relevant experience for the detective position.  Further, he has presented no evidence that the defendants were required to consider his additional years with the department during the detective selection process.  And while Haughton points to his five years as a FTO as evidence that he was more qualified, he has presented no evidence that Palmerie lacked such experience, nor any evidence indicating that the responsibilities of a FTO are comparable to those of a detective.  Further, he has pointed to no evidence contesting that the reports Palmerie submitted with her application were, unlike those he submitted, "useful" in that they "highlighted her investigative abilities," "properly established the elements of the crime being investigated," and reflected "thorough investigations [that] were well documented."  ECF

No. 32-5 at ¶ 32.  Thus, Haughton has failed to present evidence from which a reasonable juror could conclude that no reasonable person could have chosen Palmerie over Haughton.

### B.  Retaliation Claim

Title VII also prohibits employers from retaliating against an employee because the employee engaged in conduct protect by that statute.  42 U.S.C. § 2000e-3(a).  To make out a *prima facie* case of retaliation in response to a motion for summary judgment, "a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (1) conduct by the plaintiff that is protected under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).  A court may accept temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 127-28 (2d Cir. 2013) ("We have regularly held that the causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.") (internal quotation marks and alterations omitted).  Once an employee establishes a *prima facie* case, the remaining steps of the *McDonnell Douglas* burden-shifting framework apply.  *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).

I conclude that Haughton has failed to meet his burden of establishing a *prima facie* case of retaliation against the defendants.  Even if he had managed to do so, the defendants have offered a legitimate, non-retaliatory reason for Haughton's non-selection, and Haughton has failed to present evidence indicating that this reason was pretextual.

1.  Prima Facie Case

The defendants argue that Haughton has failed to establish only the causation element of the *prima facie* case.  Haughton relies on evidence of the temporal proximity between his protected conduct and his non-selection for the detective role to establish causation.  The defendants argue that the gap in time between his initiation of his lawsuit and his non-selection for the detective position is too great to support an inference of a causal connection between the two events.  They argue that the protected conduct occurred in December 2014, when Haughton filed his federal lawsuit, and that there was, therefore, a gap of over two-and-a-half years between the protected conduct and the alleged retaliatory conduct (the appointment of Palmerie as detective) in September 2017.  Haughton counters that his protected conduct continued until July 2017, when the court granted summary judgment to the defendants, and that there was, therefore, a gap of only two months between the protected conduct and the alleged retaliatory conduct.

This difference in timing is important because while the Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Summa*, 708 F.3d at 128, where "mere temporal proximity" is offered to demonstrate causation, the protected activity and adverse action must occur "very close" in time.  *Clark Cty. Sch. Dist. V. Breeden*, 532 U.S. 268, 273-74 (2001).  "Time periods greater than one year have generally been rejected when offered to indirectly establish a causal relationship between an act and its purported consequences."  *Deravin v. Kerik*, No. 00-cv-7487(KMW)(KNF), 2007 WL 1029895, at *11 (S.D.N.Y. Apr. 2, 2007) (collecting cases).  A gap of a couple months is, on the other hand, not "prohibitively remote" under Second Circuit caselaw.  *Summa*, 708 F.3d at 128 (finding that seven months between the retaliatory action and

the protected activity satisfied causal requirement); *see also Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) (suggesting that lapse of five months between protected activity and retaliation may show a causal connection); *Espinal v. Goord*, 558 F.3d 119 , 129 (2d Cir. 2009) (concluding that lapse of "only six months between dismissal of [the plaintiff's] lawsuit" and retaliatory conduct was sufficient to support inference of causal connection). Thus, if the temporal gap in this case is only two months, Haughton has likely made out a *prima facie* case of retaliation. If it is two-and-a-half years, he has not.

The Second Circuit has not set forth a clear rule for calculating the temporal proximity between a plaintiff's lawsuit and subsequent retaliatory conduct. It has held in a summary order that the "relevant starting point" for purposes of calculating temporal proximity between a lawsuit that has ended and a subsequent adverse employment action is "the filing of the lawsuit, not its ultimate resolution." *Dotson v. City of Syracuse*, 688 F. App'x 69, 73 (2d Cir. 2017) ("[The plaintiff] argues that this Court should find temporal proximity between the jury's award of damages in [her earlier lawsuit] on November 16, 2011, and the discipline, which occurred on February 13, 2012. But in order to find retaliation proven by temporal proximity, the more relevant starting point is the time of the employee's protected activity—here the filing of the lawsuit, not its ultimate resolution."). But the Circuit has also recognized that actions taken in connection with the pursuit of administrative or legal remedies are protected activity for purposes of the temporal proximity analysis. *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (holding one month between communication to colleagues that they might be contacted as witnesses in state department of human rights proceeding and retaliatory conduct sufficient to establish causal link between state department of human rights complaint and adverse action); *Richardson v. N.Y. State Dept. of Corr. Serv.*, 180 F.3d 426, 447 (2d Cir.

1999), *overruled on other grounds by Burlington Northern and Santa Fe Ry. Co. v. White*, 548

U.S. 53 (2006) (noting close timing between service of deposition notices in plaintiff's lawsuit

and subsequent abusive treatment at hands of coworkers in support of conclusion that plaintiff

had made out a *prima facie* case of retaliation).  And district courts within this circuit have held

that where litigation against an employer is ongoing at the time of the adverse action, the

requisite temporal proximity is established.  *See Singleton v. Mukasey*, No. 6-cv-6588 (GEL),

2008 WL 2512474, at *6 (S.D.N.Y. June 13, 2008), *aff'd sub nom. Singleton v. Holder*, 363 F.

App'x 87 (2d Cir. 2010) ("Because [the plaintiff's] litigation against the [defendant] was

ongoing at the time of the decisions not to promote him, such decisions necessarily followed

closely on protected activity by [the plaintiff].") (internal citation omitted); *Koenig v. City of*

*New Haven*, No. 16-cv-514 (JCH), 2018 WL 1440175, at *11 (D. Conn. Mar. 21, 2018) ("[T]his

is not a situation akin to the *Dotson* case where lengthy litigation concluded several months

before an adverse employment action, but rather a case in which [the plaintiff's lawsuit] was

being vigorously pursued and defended at precisely the same time the [defendant] was deciding

which candidates to promote…")

Unlike in *Singleton* and *Koenig*, Haughton's earlier lawsuit was not ongoing at the time

that he was not selected for the detective position.  He has also presented no evidence of whether

or when he served discovery requests, took depositions, or engaged in other actions within the

course of that litigation.  As a result, I cannot, based on the evidence available, conclude that

there was sufficient temporal proximity between his protected activity in connection with the

lawsuit and his non-selection as a detective to support an inference that the two events were

causally connected.  Thus, Haughton has failed to make out a *prima facie* case of retaliation.

2.  <u>Legitimate Reason and Pretext</u>

Even if Haughton had presented a *prima facie* case, the defendants have presented evidence that they had a legitimate reason for not selecting him for the detective position, and Haughton has failed to show that this reason is pretextual.  As discussed in more depth above in the context of Haughton's discrimination claim, the defendants have presented sufficient evidence that their decision not to offer Haughton the detective position was based upon legitimate, non-retaliatory reasoning.  Haughton has not met his burden of showing that this reasoning is pretextual.  "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847.  Haughton has not presented any evidence— besides the attenuated temporal proximity discussed above—to indicate that the defendants' stated reasons for not giving him the detective special assignment were pretextual.  As I explained above while addressing Haughton's discrimination claim, he has failed to present evidence indicating that the defendants failed to follow statutory or internal guidelines during the selection process or that his qualifications were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie*, 243 F.3d at 103. Further, he acknowledges that he never discussed his prior lawsuit with Lamontagne, VanderSloot, or Penn (none of whom was named as a defendant in the suit), ECF No. 32-2 at ¶ 65, and he has presented no direct evidence that they had the desire or intent to retaliate against him for the filing of that suit.  He also acknowledged that he does not think Penn would retaliate against him for his prior suit.  ECF No. 32-2 at ¶ 51.  In sum, he has presented no evidence from which a reasonable juror could conclude that the defendants' reason for not making him

detective was a pretext and that the actual motivation for the decision was the desire to retaliate against him for filing his lawsuit.

### C.  Claims Against the CPD

Because I conclude that the defendants are entitled to summary judgment on Haughton's discrimination and retaliation claims, I do not address their argument that the CPD is not an entity capable of being sued.

### IV.       Conclusion

Defendants' motion for summary judgment (ECF No. 32) is GRANTED.


IT IS SO ORDERED.

                                                                    _____/s/_____
                                                                    Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                September 17, 2021